UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL P. O'NEIL,<br><br>            Plaintiff,<br><br>      v.<br><br>A. BUNCH, et al.,<br><br>            Defendants. | Case No. 1:23-cv-00597-EPG (PC)<br><br>ORDER TO ASSIGN A DISTRICT JUDGE<br><br>FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT THIS ACTION BE DISMISSED, WITH PREJUDICE, FOR FAILURE TO STATE A CLAIM, FAILURE TO PROSECUTE, AND FAILURE TO COMPLY WITH A COURT ORDER<br><br>(ECF Nos. 1, 6).<br><br>OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS |

Plaintiff Michael O'Neil is a state prisoner proceeding *pro se* in this civil rights action filed pursuant to 42 U.S.C. § 1983, which includes a state law claim.  Plaintiff filed the complaint commencing this action on April 18, 2023.  (ECF No. 1).  Plaintiff alleges that, because of his activity as a Men's Advisory Council Representative, he was placed in the Administrative Segregation Unit.  He also alleges that, because he verbally addressed his medical and housing grievances, Defendants violated his medical privacy and wrote false statements on his paperwork regarding why he could not be housed in a dormitory setting.

1

On August 1, 2023, the Court screened the complaint and concluded that Plaintiff failed to state any cognizable claims.  (ECF No. 6).  The Court gave Plaintiff thirty days from the date of service of the order to file an amended complaint or to notify the Court that he wanted to stand on his complaint.  (Id. at 18).  And the Court warned Plaintiff that "[f]ailure to comply with this order may result in the dismissal of this action." (Id.).

The thirty-day deadline has passed, and Plaintiff has not filed an amended complaint or otherwise responded to the Court's order.  Accordingly, for the reasons below, the Court will recommend that Plaintiff's case be dismissed, with prejudice, for failure to state a claim, failure to prosecute, and failure to comply with a court order.

## I.    SCREENING REQUIREMENT

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity.  28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b)(1), (2).

A complaint is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  A plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).  The mere possibility of misconduct falls short of meeting this plausibility standard.  Id. at 679.  While a plaintiff's allegations are taken as true, courts "are not required to indulge unwarranted inferences." Doe I v. Wal-Mart Stores, Inc., 572 F.3d 677, 681 (9th Cir. 2009) (citation and internal quotation marks omitted).  Additionally, a plaintiff's legal conclusions are not accepted as true.  Iqbal, 556 U.S. at 678.

Pleadings of *pro se* plaintiffs "must be held to less stringent standards than formal

2

pleadings drafted by lawyers." Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir. 2010) (holding that *pro se* complaints should continue to be liberally construed after Iqbal).

## II.     SUMMARY OF PLAINTIFF'S COMPLAINT

Plaintiff alleges as follows in his complaint:

The incidents occurred at Sierra Conservation Center (SCC).

Plaintiff is a forty-year-old inmate serving a determinate sentence for numerous felony convictions that he pled guilty to.  During his time in prison, he suffered from colorectal cancer, which was treated with radiation and chemotherapy.  By the grace of God and good medicine, Plaintiff's cancer was cured and he survived.  However, due to the treatment and aftereffects, Plaintiff suffers from incontinence of stool.

Through this Plaintiff became a better person by wanting to help people.  So, while at SCC in C Facility, Plaintiff was assigned as a Men's Advisory Council ("MAC") Representative.

A MAC Representative is a free speech position approved by correctional staff at all institutions throughout California.  Responsibilities of a MAC representative include advocating on behalf of the inmate population, as well as addressing grievances inmates have such as concerns about lack of programing and even staff misbehavior towards inmates.

Plaintiff was a MAC Representative on C Facility from 2020 to 2022.

Plaintiff arrived on C-Facility around the beginning of 2018.

Plaintiff was a very effective MAC Representative, as he was able to keep peace among inmates as well as greatly reduce violence and often prevent fights.

This obviously became a problem for correctional officers and higher authorities at SCC.

Approximately 20-30 days prior to Plaintiff being placed in the Administrative Segregation Unit ("ASU"), defendant Escamilla told Plaintiff he was doing too much on the yard and was starting to "piss off the higher[-]ups."

On September 6, 2022, defendant Escamilla placed Plaintiff in the ASU, pending an investigation.

Defendant Escamilla provided Plaintiff with five separate Confidential Informant Disclosure Forms.

Confidential Source No. 3 alleged that on Wednesday, June 8, 2022, Plaintiff battered Confidential Source No. 3 due to drug activities.  Confidential Source No. 3 considered Plaintiff an enemy because of this.  Plaintiff was not notified on June 8, 2022, about these allegations, nor was Plaintiff ever disciplined based on these allegations.

On Thursday, June 9, 2022, Confidential Source No. 4 identified Plaintiff as engaging in drug activities and accumulating a drug debt.  Confidential Source No. 4 considers Plaintiff an enemy.  Plaintiff never received a drug test to confirm this allegation or a Rules Violation Report.  He also did not receive any notice about a confidential informant making such allegations until September 13, 2022.

On Friday, August 5, 2022, Confidential Source No. 5 identified Plaintiff as participating in drug activities and supplying methamphetamines to multiple inmates.  Confidential Source No. 5 considers Plaintiff an enemy.  Plaintiff never received any notice of these allegations, nor a Rules Violation Report for any type of drug activities.  He was never even searched based on these allegations of drug activity.

On Wednesday, August 31, 2022, Confidential Source No. 1 stated that Plaintiff battered Confidential Source No. 1 several times, accumulated drug debts, and ordered assaults on behalf of the Northern Ryders.  Confidential Source No. 1 considers Plaintiff an enemy for assaulting him.  Plaintiff never received notice on August 31, 2022, about these allegations, nor did he receive a Rules Violation Report for assaulting anyone on August 31, 2022.

On Thursday, September 1, 2022, Confidential Source No. 6 alleged that Plaintiff threatened him numerous times with violence, and therefore considered Plaintiff an enemy.

Plaintiff denies all allegations made by the five separate confidential informants.

It was not until September 13, 2022, when defendant Escamilla served Plaintiff with five separate Confidential Information Disclosure Forms describing the false accusations that Plaintiff even knew about the allegations.

On September 13, 2022, defendant Escamilla told Plaintiff that she promised, "you

won't ever be our problem on C Yard again," and walked away laughing.

On September 13, 2022, defendant Bunch ordered Plaintiff to be housed in the ASU due to non-specific safety concerns at SCC, that there was no other available housing at SCC, and that his life would be in danger.

During that time, defendant Pena came by Plaintiff's cell and explained they could and would possibly place Plaintiff on A or B facility, which is dormitory housing.

Plaintiff is a Level 2 inmate, which is the second lowest security.  It is designated for inmates who are good programmers throughout the California Department of Corrections and Rehabilitation and therefore are housed in dormitories.

However, due to Plaintiff's colorectal cancer and treatment, Plaintiff has a doctor's order for permanent in-cell living due to stool incontinence.  The only reason Plaintiff was housed in Facility C is because of its cell living.  When Plaintiff explained this to defendant Pena, defendant Pena got angry and said, "we determine where your [sic] going to be housed, not medical." Plaintiff replied, "I have rights and a Doctor ordered it, you can't go against what a doctor [says]."

On September 15, 2022, when Plaintiff appeared before defendants Pena, Thompson, and Harris at a Committee Hearing, defendant Thompson began by saying "your [sic] in here today because your [sic] scared of everybody, because you wear diapers."  Feeling disrespected, Plaintiff said, "I never told you nothing about my medical business, you have no right to violate my medical privacy, I'm only saying I feel uncomfortable using the restroom in Dormitories, which is one of the reasons I've always had a Doctors [sic] order not to live in dorms, but cell living only."

Plaintiff further expressed that he had done nothing wrong and should not be retaliated against for addressing his medical concerns.  Defendant Thompson then had Plaintiff removed from the Institutional Classification Committee (IC") hearing.  Soon thereafter defendant Pena provided Plaintiff with a Classification Committee Chrono dated September 15, 2022.  It was signed by defendants Pena, Thompson, and Harris.

In that chrono they falsely wrote that Plaintiff cannot live in a dorm due to wearing

5

adult diapers, and that he will not be able to house in a dorm "due to potential for victimization due to incontinence supplies." This is false, and Plaintiff never said that. Plaintiff believes that defendant Thompson was the "Recorder," and purposely wrote that with the intention of getting Plaintiff assaulted.

Specifically, Plaintiff is a documented affiliate of the STGII — Northern Ryders. Defendants Thompson, Pena, and Harris know, through their correctional expertise, that Plaintiff must show the Committee action, which they generate. So, by writing in Plaintiff's chrono that he fears he may get victimized due to using incontinence supplies, it is the same as labeling him a snitch.

This is so because to say you will get victimized is like snitching. However, Plaintiff never said he feared for his safety, but rather that he has had a doctor's order to stay in a single cell since 2020 due to his medical condition.

Defendants Thompson and Pena retaliated against Plaintiff for voicing his doctor's orders by falsifying his chrono, where they not only exposed his personal and privileged medical information by listing a detailed description of the medical supplies that he used, but they also placed his safety in jeopardy by putting on his chrono that he fears for his safety.

To ensure other inmates would become aware of this false rumor, they conspired with defendant Bunch by having him reissue an "ASU Placement Notice." The document stated in part: "during ICC on September 15, 2022, you expressed safety concerns related to a medical condition and indicated you did not feel safe being housed in a dormitory setting."

It is common knowledge among correctional officers and inmates that these ASU documents are printed out by inmate clerks. It is further common knowledge that this paperwork is something all inmates in ASU must show each other, so other inmates know that the person around them is not a snitch.

If the ASU document makes comments about the inmate expressing safety concerns, then word spreads and the inmate will eventually be targeted for assault, and even murdered, for bad paperwork like that.

Plaintiff never expressed any safety concerns and all of that is false. Defendants

6

Thompson, Pena, Harris, and Bunch all generated falsified documents with the correctional common knowledge and experience that Plaintiff could get targeted for assault, simply for what they wrote in a report.

As a result of the stress Plaintiff endured as a direct and proximate cause of Defendants' acts, Plaintiff was seen by mental health staff and placed in a higher level of care, known as the "Enhanced Outpatient Program."

On September 22, 2022, Plaintiff had another ICC hearing. Plaintiff appeared before defendants Heusel, Wetenkamp, and Harris. Immediately Plaintiff began addressing defendant Wetenkamp, saying, "how can you guys lie on my paperwork saying I fear for my safety, and then expose my personal medical history which I didn't authorize!"

Defendant Wetenkamp ignored Plaintiff's statement and began reading a prewritten and determined Committee action, which once again said that Plaintiff expressed safety concerns, saying that he did not feel safe in a dormitory setting. Plaintiff interrupted, saying "I never said that, I only said I've had a Doctors [sic] orders for years I can only be housed in a cell due to a medical condition, not my safety, so quit trying to get me stabbed by lying on my paperwork like that."

As an expert in correctional settings of a California prison, defendants Wetenkamp, Heusel, and Harris all know that inmates with "Bad Paperwork" get assaulted and murdered sometimes. So when they put that an inmate has expressed safety concerns, that will in fact put a target on that inmate's back, because it is the same as snitching.

Defendant Wetenkamp said with a smirk, "well thats [sic] what we are putting on your paperwork, and nothing is going to change that."

Defendant Wetenkamp then ordered the officers to escort Plaintiff out of the Committee room, and told Plaintiff, as he was being escorted out, "and Mr. O'Neil, I hope you have a very Happy Birthday," being that on that date, it was in fact Plaintiff's birthday.

Thereafter, defendant Wetenkamp, along with defendant Heusel, came up to Plaintiff's cell door and slid his Classification Committee Chrono under the door. It was signed by them and said that Plaintiff expressed safety concerns related to a medical condition.

7

Right after other inmates began requesting to see his paperwork, since they saw Defendants Wetenkamp and Heusel slide it under his door.

Later in September Plaintiff was transferred to California State Prison, Corcoran. It is only a matter of time before other inmates arrive from SCC, spreading rumors as a direct result of defendants Pena, Heusel, Wetenkamp, Harris, and Thompsons' comments verbally and on generated documents as described, thereby placing Plaintiff in a position of being assaulted, or even murdered.

Plaintiff brings an Eighth Amendment failure to protect claim, a retaliation claim, and a state law medical privacy claim pursuant to California Civil Code Sections 56.10 and 56.26.

Plaintiff attaches over 100 pages of exhibits to his complaint.

### III.   ANALYSIS OF PLAINTIFF'S COMPLAINT

#### A.   Section 1983

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)); see also Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 618 (1979); Hall v. City of Los Angeles, 697 F.3d 1059, 1068 (9th Cir. 2012); Crowley v. Nevada, 678 F.3d 730, 734 (9th Cir. 2012); Anderson v. Warner, 451 F.3d 1063, 1067 (9th Cir. 2006).

To state a claim under section 1983, a plaintiff must allege that (1) the defendant acted under color of state law, and (2) the defendant deprived him of rights secured by the Constitution or federal law. Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006); see also Marsh v. County of San Diego, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state law"). A person deprives another of a constitutional right, "within the

meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'"  Preschooler II v. Clark County Sch. Bd. of Trs., 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)).  "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms."  Preschooler II, 479 F.3d at 1183 (quoting Johnson, 588 F.2d at 743).  This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause."  Arnold v. Int'l Bus. Mach. Corp., 637 F.2d 1350, 1355 (9th Cir. 1981); see also Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008).

A plaintiff must demonstrate that each named defendant personally participated in the deprivation of his rights.  Iqbal, 556 U.S. at 676-77.  In other words, there must be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff.  See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691, 695 (1978).

Supervisory personnel are not liable under section 1983 for the actions of their employees under a theory of *respondeat superior* and, therefore, when a named defendant holds a supervisory position, the causal link between the supervisory defendant and the claimed constitutional violation must be specifically alleged.  Iqbal, 556 U.S. at 676-77; Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  To state a claim for relief under section 1983 based on a theory of supervisory liability, a plaintiff must allege some facts that would support a claim that the supervisory defendants either: were personally involved in the alleged deprivation of constitutional rights, Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989); "knew of the violations and failed to act to prevent them," Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); or promulgated or "implement[ed] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation," Hansen, 885 F.2d at 646 (citations and internal quotation marks omitted).

1    For instance, a supervisor may be liable for his or her "own culpable action or inaction

2    in the training, supervision, or control of his [or her] subordinates," "his [or her] acquiescence

3    in the constitutional deprivations of which the complaint is made," or "conduct that showed a

4    reckless or callous indifference to the rights of others."  Larez v. City of Los Angeles, 946 F.2d

5    630, 646 (9th Cir. 1991) (citations, internal quotation marks, and brackets omitted).

6                  B.  Failure to Protect in Violation of the Eighth Amendment

7        To establish a failure to protect claim, a prisoner must establish that prison officials

8    were deliberately indifferent to a sufficiently serious threat to the prisoner's safety.  Farmer v.

9    Brennan, 511 U.S. 825, 837 (1994).  "'Deliberate indifference' has both subjective and

10   objective components."  Labatad v. Corr. Corp. of Am., 714 F.3d 1155, 1160 (9th Cir. 2013).

11   A prisoner must show that "the official [knew] of and disregard[ed] an excessive risk to inmate

12   . . . safety; the official must both be aware of facts from which the inference could be drawn

13   that a substantial risk of serious harm exists, and [the official] must also draw the inference."

14   Farmer, 511 U.S. at 837.  "Liability may follow only if a prison official 'knows that inmates

15   face a substantial risk of serious harm and disregards that risk by failing to take reasonable

16   measures to abate it.'"  Labatad, 714 F.3d at 1160 (quoting Farmer, 511 U.S. at 847).

17       As a general rule, statements in paperwork, even false or inaccurate statements, are

18   insufficient to state a cognizable claim.  Slaughter v. Cate, 2014 WL 5474025, at *5 (N.D. Cal.

19   Oct. 28, 2014) ("[T]he Due Process Clause does not automatically protect the accuracy of [a

20   plaintiff's] prison file.");  Alvarez v. Horel, 2009 WL 1370895, at *3-4 (N.D. Cal. May 14,

21   2009) (dismissing a plaintiff's claims for false information in the plaintiff's central file because

22   California regulations do not create a protected liberty interest in accurate personal information

23   records);  Pimentel v. Beard, 2017 WL 977588, at *5 (E.D. Cal. Mar. 13, 2017) ("[T]here are

24   few situations in which false information in a prisoner's record is actionable under § 1983.").

25   Thus, Plaintiff's allegation that the reason given for his placement in his classification

26   document was false does not state a constitutional claim.

27       One limited exception to the general rule involves labeling an inmate a "snitch."  The

28   Ninth Circuit has held that telling inmates that someone is a "snitch" with the intent of having

an inmate killed by other inmates could state a claim for a violation of the inmate's right to be protected from violence while in custody.  Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989) (upholding a failure to protect claim where Plaintiff "alleged that because he had petitioned prison and government officials for redress of his grievances, [Defendants] had conspired to label him a 'snitch' and thereby subject him to retaliation by inmates").  However, in that case, Plaintiff alleged that "he was approached by fellow prisoners and threatened with harm because [Defendants] had told other inmates in the law library that [Plaintiff] was a snitch. Valandingham alleged that Bojorquez and Moen labeled him a "snitch" with the intent of having Valandingham killed by inmates." Id. at 1138 (internal citations omitted).

Plaintiff's allegations are distinguishable from the circumstances in Valandingham and fail to state a claim.  As an initial matter, Plaintiff does not allege that Defendants labelled him a "snitch."  Rather, Plaintiff alleges that certain defendants wrote (or endorsed) a chrono that stated that Plaintiff will not be able to house in a dorm "due to potential for victimization due to incontinence supplies."  (ECF No. 1, p. 8).  (See also ECF No. 1, p. 20) ("[H]owever, due to medical supplies/condition, ONEILL [sic] expresses victimization concerns if housed in a dormitory setting."), and (id. at 9) (alleging that defendant Bunch issued an "ASU Placement Notice" stating: "during ICC on September 15, 2022, you expressed safety concerns related to a medical condition and indicated you did not feel safe being housed in a dormitory setting.").  Additionally, unlike in Valandingham, Plaintiff does not allege that any defendant gave any information to other inmates or otherwise showed an intent to have Plaintiff killed or otherwise harmed; instead, Defendants included information on Plaintiff's own classification documents given to Plaintiff.  Additionally, Plaintiff has not alleged that any other inmate harmed him or threatened to do so.  On the contrary, Plaintiff has alleged that he was transferred to another institution as a result of the classification.  Taken together, and unlike in Valandingham, Plaintiff's allegations even if true fail to show that Defendants acted with deliberate indifference to a substantial risk or harm.

Instead, this case is more akin to Morgan v. MacDonald, 41 F.3d 1291, 1293-94 (9th Cir. 1994), where the Ninth Circuit denied a similar claim where the plaintiff did not allege he

11

was actually subjected to retaliation by fellow inmates or that the defendant was aware that the statement exposed the plaintiff to a substantial risk of serious harm.  See also Brummett v. Lopez, 2021 WL 3722779, at *3 (E.D. Cal. Aug. 23, 2021) ("However, in order to demonstrate that [the defendant] was aware that his actions exposed Plaintiff to a substantial risk of serious harm, Plaintiff must allege facts demonstrating that he was either physically harmed or was threatened with physical harm because of the 'snitch' label."), report and recommendation adopted, 2021 WL 4317968 (E.D. Cal. Sept. 23, 2021).

Moreover, many of Plaintiff's allegations are conclusory.  Nothing any defendant said suggests that the defendant stated that Plaintiff has safety concerns in order to have Plaintiff harmed by other inmates.  Additionally, Plaintiff does not sufficiently allege that any defendant knew that stating that Plaintiff has safety concerns in either a chrono or ASU Placement Notice would expose Plaintiff to a substantial risk of harm.  Plaintiff's conclusory allegations that these defendants knew that putting this information in these documents was the same as labeling Plaintiff a snitch simply because they are correctional officials are insufficient.

Accordingly, Plaintiff fails to sufficiently allege that any defendant was aware that noting that Plaintiff has safety concerns in a document would expose Plaintiff to a substantial risk of serious harm, and thus fails to state a failure to protect claim against any defendant.

C.   Retaliation in Violation of the First Amendment

There are five basic elements to a First Amendment retaliation claim: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

"'[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm,' Brodheim, 584 F.3d at 1269, that is 'more than minimal,' Robinson, 408 F.3d at 568 n.11.  That the retaliatory conduct did not chill the plaintiff from suing the alleged retaliator does not defeat the retaliation claim at the motion to dismiss stage.  Id. at 569."  Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012) (alteration in original).

While prisoners have no freestanding right to a prison grievance process, see Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003), "a prisoner's fundamental right of access to the courts hinges on his ability to access the prison grievance system," Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995), overruled on other grounds by Shaw v. Murphy, 532 U.S. 223, 230 n.2 (2001).  Because filing administrative grievances and initiating civil litigation are protected activities, it is impermissible for prison officials to retaliate against prisoners for engaging in these activities.  Rhodes, 408 F.3d at 567.

Plaintiff alleges that he was a very effective MAC Representative, as he was able to keep peace among inmates as well as greatly reduce violence and often prevent fights. Approximately 20-30 days prior to Plaintiff being placed in the Administrative Segregation Unit (ASU), defendant Escamilla told Plaintiff he was doing too much on the yard and was starting to, "piss off the higher[-]ups."  On September 6, 2022, defendant Escamilla placed Plaintiff in the ASU, pending an investigation.  It was not until September 13, 2022, when defendant Escamilla served Plaintiff with five separate Confidential Information Disclosure Forms describing the false accusations that Plaintiff even knew about the allegations.  On September 13, 2022, defendant Escamilla told Plaintiff that she promised, "you won't ever be our problem on C Yard again," and walked away laughing.

Plaintiff further alleges that, in retaliation for verbally addressing his medical and housing grievances, defendants wrote false statements on Plaintiff's paperwork.

The Court finds that Plaintiff fails to state a retaliation claim against any defendant.

As to Plaintiff's initial placement in ASU, Plaintiff does not sufficiently allege that this occurred because Plaintiff engaged in protected conduct.  Plaintiff alleges that defendant Escamilla told that him that he was doing too much, and that he was starting to, "piss off the higher[-]ups."  However, this occurred approximately a month before Plaintiff was placed in ASU, and Plaintiff does not sufficiently allege what conduct defendant Escamilla was referring to.  Plaintiff appears to allege that someone fabricated Confidential Informant Disclosure Forms because he kept the peace and greatly reduced violence among inmates, but there are no allegations tying any defendant to the allegedly fabricated confidential statements by inmates.

Moreover, there are no allegations, such as something any defendant said or did, suggesting that any defendant retaliated against Plaintiff for keeping the peace.  Finally, there is only a constitutional claim for retaliation if the adverse action is taken due to Plaintiff engaging in protected conduct, and generally being active in the MAC is not constitutionally protected conduct.  While filing a grievance is constitutionally protected conduct, see Rhodes, 408 F.3d at 567, there are no facts linking the ASU placement with the filing of grievance(s).  Accordingly, Plaintiff fails to state a retaliation claim based on his initial placement in ASU.

As to Plaintiff's allegations that, in retaliation for verbally addressing his medical and housing grievances, Defendants retaliated by writing false statements and violating Plaintiff's privacy, Plaintiff also fails to state a claim against any defendant.

To begin, there are no allegations suggesting that defendant Escamilla took any action, let alone an adverse action, against Plaintiff because he addressed his medical and housing grievances to her.  At the first ICC hearing, Plaintiff alleges it was defendant Thompson (not defendant Pena) who said "your [sic] in here today because your [sic] scared of everybody, because you wear diapers," and that this occurred at the beginning of the hearing (before Plaintiff said anything to defendant Thompson).[1]  There are no allegations suggesting that defendant Thompson fabricated Plaintiff's safety concerns because Plaintiff previously told defendant Pena or defendant Thompson that he had a doctor's order for in-cell living, and this statement was made before Plaintiff addressed defendant Thompson.  Accordingly, Plaintiff fails to sufficiently allege that defendant Thompson took an adverse action against Plaintiff because Plaintiff verbally addressed his medical and housing grievances.  While defendants Pena and Harris also signed off on the ICC chrono, which included a similar statement, Plaintiff does not sufficiently allege that these defendants did so because Plaintiff engaged in protected conduct.

At the second ICC hearing, while defendants Heusel, Wetenkamp, and Harris allegedly

---

[1] Plaintiff also alleges that he believes defendant Thompson was the "Recorder" at the meeting and was the one who wrote the statement on the chrono.

failed to correct the false information in Plaintiff's ICC chrono, there are no allegations

suggesting that this failure was a retaliatory act because Plaintiff addressed his medical and

housing grievances.  In fact, Plaintiff alleges that defendant Wetenkamp's remarks, which

included the statement that Plaintiff expressed safety concerns, were "prewritten," and thus

drafted before Plaintiff addressed the Committee.  Plaintiff also alleges that the Committee's

action was already determined.  Thus, based on Plaintiff's allegations, Plaintiff does not

sufficiently allege that Defendants took an adverse action against him based on prior protected

conduct.

As to Plaintiff's allegations that defendants Thompson and Pena conspired with

defendant Bunch to ensure that other inmates would become aware of the false statement, there

are no factual allegations, such as anything any of these defendants said or did, to support

Plaintiff's conclusory assertion of a conspiracy between these defendants.[2]

Accordingly, Plaintiff fails to state a retaliation claim against any defendant.

D.   State Law Claim for Medical Privacy

Plaintiff brings a state law claim.  However, Plaintiff has not pled compliance with

California's Government Claims Act.  California's Government Claims Act[3] requires that a

claim against the State[4] or its employees "relating to a cause of action for death or for injury to

person or to personal property" be presented to the Department of General Services'

Government Claims Program no more than six months after the cause of action accrues.  Cal.

_____

[2] To state a claim for conspiracy under section 1983, Plaintiff must show the existence of an agreement or meeting of the minds to violate constitutional rights, Avalos v. Baca, 596 F.3d 583, 592 (9th Cir. 2010); Franklin v. Fox, 312 F.3d 423, 441 (9th Cir. 2001), and that an "actual deprivation of his constitutional rights resulted from the alleged conspiracy," Hart v. Parks, 450 F.3d 1059, 1071 (9th Cir. 2006) (quoting Woodrum v. Woodward County, Oklahoma, 866 F.2d 1121, 1126 (9th Cir. 1989)).  "'To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.'"  Franklin, 312 F.3d at 441 (quoting United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1541 (9th Cir.1989)).  Additionally, Plaintiff must show that Defendants "conspired or acted jointly in concert and that some overt act [was] done in furtherance of the conspiracy."  Sykes v. State of California, 497 F.2d 197, 200 (9th Cir. 1974).  "[M]ore than vague conclusory allegations are required to state a [conspiracy] claim."  Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).
[3] This Act was formerly known as the California Tort Claims Act.  City of Stockton v. Superior Court, 42 Cal. 4th 730, 741-42 (Cal. 2007) (adopting the practice of using Government Claims Act rather than California Tort Claims Act).
[4] "'State' means the State and any office, officer, department, division, bureau, board, commission or agency of the State claims against which are paid by warrants drawn by the Controller."  Cal. Gov't Code § 900.6.

15

Gov't Code §§ 905.2, 910, 911.2, 945.4, 950-950.2.  Presentation of a written claim, and action on or rejection of the claim, are conditions precedent to suit.  State v. Superior Court of Kings County (Bodde), 32 Cal.4th 1234, 1245 (Cal. 2004); Mangold v. California Pub. Utils. Comm'n, 67 F.3d 1470, 1477 (9th Cir. 1995).  To state a tort claim against a public entity or employee, a plaintiff must allege compliance with the Government Claims Act.  Bodde, 32 Cal.4th at 1245; Mangold, 67 F.3d at 1477; Karim-Panahi v. Los Angeles Police Dept., 839 F.2d 621, 627 (9th Cir. 1988).

Plaintiff fails to state any state law claims because he has not alleged facts demonstrating or excusing compliance with California's Government Claims Act.[5]

Moreover, Plaintiff fails to sufficiently allege that California Civil Code Section 56.10 or Section 56.26 applies to the defendants in this action.  California Civil Code Section 56.10(a) states: "A provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization, except as provided in subdivision (b) or (c)."  California Civil Code Section 56.26(a) states: "No person or entity engaged in the business of furnishing administrative services to programs that provide payment for health care services shall knowingly use, disclose, or permit its employees or agents to use or disclose medical information possessed in connection with performing administrative functions for a program, except as reasonably necessary in connection with the administration or maintenance of the program, or as required by law, or with an authorization."

Plaintiff fails to sufficiently allege that the correctional official defendants are providers of health care, a health care service plan, or contractors.  Plaintiff also fails to sufficiently allege that any of the correctional official defendants are engaged in the business of furnishing administrative services to programs that provide payment for health care services.

Accordingly, Plaintiff fails to state a claim under California Civil Code Section 56.10 or

---

[5] Plaintiff does attach a Government Claim Form to his complaint.  (ECF No. 1, pgs. 15-16).  However, he does not refer to this exhibit or otherwise allege compliance in his complaint.  Moreover, Plaintiff does not attach the response, if any, he received.

Section 56.26.

## IV.    FAILURE TO PROSECUTE AND COMPLY WITH COURT ORDERS

The Court will likewise recommend dismissal based on Plaintiff's failure to prosecute this case and to comply with the Court's screening order.

> In determining whether to dismiss a[n] [action] for failure to prosecute or failure to comply with a court order, the Court must weigh the following factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to defendants/respondents; (4) the availability of less drastic alternatives; and (5) the public policy favoring disposition of cases on their merits.

Pagtalunan v. Galaza, 291 F.3d 639, 642 (9th Cir. 2002) (citing Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61 (9th Cir. 1992)).

"'The public's interest in expeditious resolution of litigation always favors dismissal.'" Id. (quoting Yourish v. California Amplifier, 191 F.3d 983, 990 (9th Cir. 1999)).  Accordingly, this factor weighs in favor of dismissal.

As to the Court's need to manage its docket, "[t]he trial judge is in the best position to determine whether the delay in a particular case interferes with docket management and the public interest. . . . It is incumbent upon the Court to manage its docket without being subject to routine noncompliance of litigants. . . ." Id.  Plaintiff has failed to respond to the Court's screening order.  This failure to respond is delaying the case and interfering with docket management.  Therefore, the second factor weighs in favor of dismissal.

Turning to the risk of prejudice, "pendency of a lawsuit is not sufficiently prejudicial in and of itself to warrant dismissal." Id. (citing Yourish, 191 F.3d at 991).  However, "delay inherently increases the risk that witnesses' memories will fade and evidence will become stale," id. at 643, and it is Plaintiff's failure to comply with a court order and to prosecute this case that is causing delay.  Therefore, the third factor weighs in favor of dismissal.

As for the availability of lesser sanctions, given that Plaintiff has chosen not to prosecute this action and has failed to comply with the Court's order, despite being warned of possible dismissal, there is little available to the Court which would constitute a satisfactory lesser sanction while protecting the Court from further unnecessary expenditure of its scarce

resources.  Considering Plaintiff's incarceration status, it appears that monetary sanctions are of little use.  And given the stage of these proceedings, the preclusion of evidence or witnesses is not available.

Finally, because public policy favors disposition on the merits, this factor weighs against dismissal. *Id.*

After weighing the factors, the Court finds that dismissal is appropriate.

## V.     CONCLUSION, ORDER, AND RECOMMENDATIONS

Based on the forgoing, IT IS ORDERED that the Clerk of Court shall assign a District Judge to this case.

Further, IT IS RECOMMENDED as follows:

1.     This action be dismissed, with prejudice, for failure to state a claim, failure to prosecute, and failure to comply with a court order; and

2.     The Clerk of Court be directed to close this case.

These findings and recommendations are submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within fourteen (14) days after being served with these findings and recommendations, Plaintiff may file written objections with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **September 18, 2023**          /s/ *Erica P. Grosjean*

UNITED STATES MAGISTRATE JUDGE

18